# In the United States Court of Federal Claims

No. 17-1275T

(Filed: August 15, 2018)

| | |
|---|---|
| *********************************** | |
| DAVID S. PARESKY and LINDA K. PARESKY, | Taxpayers' claim for overpayment interest; invocation of I.R.C. §§ 6411, 6611(e); claim for overpayment interest not a claim for refund of tax; jurisdiction under the Tucker Act; 28 U.S.C § 1491(a)(1); statute of limitations; 28 U.S.C § 1501; split in the circuits over basis of claim to overpayment interest; transfer; 28 U.S.C § 1631 |
| Plaintiffs, | |
| v. | |
| UNITED STATES, | |
| Defendant. | |
| *********************************** | |

Laurin H. Mills, LeClairRyan, PC, Alexandria, VA, for plaintiffs. With him on the briefs were Elizabeth J. Atkinson, LeClairRyan, PC, Norfolk, VA, Edward L. Glazer, Goodwin Procter LLP, Boston, MA, and Nicole Hardin Brakstad, LeClairRyan, PC, Richmond VA.

Jason Bergmann, Trial Attorney, Tax Division, United States Department of Justice, Washington, DC, for defendant. With him on the briefs were Richard E. Zuckerman, Principal Deputy Assistant Attorney General, Tax Division, and David I. Pincus, Chief, Court of Federal Claims Section, United States Department of Justice, Washington, DC.

**OPINION AND ORDER**

LETTOW, Judge.

Plaintiffs, David and Linda Paresky, have filed suit seeking overpayment interest they contend they are owed on certain tax refunds they received stemming from losses incurred in 2008 and carried back to tax years 2003 through 2007. Compl. ¶¶ 4-6. Plaintiffs assert that they are entitled to overpayment interest on those refund amounts "because the refunds were not issued within 45 days of the filing of" the tax forms requesting the refunds. Compl. ¶ 6.[1] By plaintiffs' calculations, they are entitled to interest in the amount of $417,496.77 from April 15, 2009 through the dates on which the refunds were issued and interest on that interest continually accruing until eventual payment, which amount they calculate as totaling $118,099.18 as of September 15, 2017, the date plaintiffs filed suit. Compl. ¶ 29; Compl. Ex. I.

---

[1]The reference to 45 days reflects the provisions of 26 U.S.C. § 6611(e), which pertain to claims for interest on overpayments. The significance of that statutory provision is addressed *infra*, at 3-4 & n.5.

The United States has moved to dismiss plaintiffs' complaint, asserting that plaintiffs' claims are time-barred as outside the six-year limitations period governing claims brought under the Tucker Act, 28 U.S.C. § 1491(a)(1).  Def.'s Mot. to Dismiss for Lack of Subject Matter Jurisdiction ("Def.'s Mot."), at 1 (citing 28 U.S.C. § 2501), ECF No. 11.  Plaintiffs' opposition to this motion puts forward arguments that, they claim, make their suit timely.  They argue first that the applicable limitations period is not the general six-year limitations period in 28 U.S.C. § 2501 but rather the limitations period applicable to suits for refund specified by 26 U.S.C. ("I.R.C.") § 6532; next, that if the six-year limitations period applies, the relevant date on which it began to run was January 25, 2013, when the Internal Revenue Service ("IRS") "expressly approved all of the overassessments claimed by [p]laintiffs . . . in its report to the Joint Committee on Taxation" ("JCT"); and, finally, that if the six-year limitations period applies and plaintiffs' suit is held to be untimely, that the court transfer the case to the United States District Court for the Southern District of Florida, where plaintiffs can assert in that court arguments as to tolling the statute of limitations and as to the proper statute of limitations to apply.  *See* Pls.' Opp'n to the Government's Mot. to Dismiss ("Pls' Opp'n") at 1-4, ECF No. 18; Pls.' Mem. of Law in Support of Pls.' Mot. to Transfer to Cure Want of Jurisdiction ("Pls.' Cross-Mot.") at 1, ECF No. 19; *see also* Hr'g Tr. 86:8 to 88:17, 98:13-15, 99:3-9 (June 20, 2018) (discussing potential transfer to the United States District Court for the Southern District of Florida).[2]

The parties' motions have been fully briefed, and a hearing was held on June 20, 2018.  At the hearing, the court requested supplemental briefing from the parties regarding the application of I.R.C. § 6511 in the potential transferee court.  That briefing having been completed on August 10, 2018, these motions are ready for decision.

## BACKGROUND[3]

The chronology of the Pareskys' dispute with the IRS is complex, spanning the better part of a decade.  The instant case stems from a net operating loss that the Pareskys, married

---

[2]Plaintiffs originally suggested transfer to the United States District Court for the District of Massachusetts, *see* Pls.' Opp'n at 27; Pls.' Cross-Mot. at 1, but after briefing and the hearing, advocated transfer to the United States District Court for the Southern District of Florida, *see* Pls.' Suppl. Br. In Support of Mot. to Transfer (Pls.' Suppl. Br.") at 5-8, ECF No. 47.

Further citations to the transcript of the hearing held on June 20, 2018 will omit reference to the date.

[3]If a motion to dismiss for lack of subject matter jurisdiction "denies or controverts the pleader's allegations of jurisdiction . . . the allegations in the complaint are not controlling, . . . and only uncontroverted factual allegations are accepted as true for purposes of the motion. . . . All other facts underlying the controverted jurisdictional allegations are in dispute and are subject to fact-finding by the district court. . . .  In establishing the predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review extrinsic evidence to the pleadings, including affidavits and deposition testimony."  *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993).  For purposes of determining the jurisdictional predicates of the Pareskys' case, the facts set out are drawn from the parties' briefing and the exhibits they have appended to those briefs.

taxpayers living in Fisher Island, Florida, *see* Compl. ¶ 30, experienced in 2008 as a result of the Bernie Madoff Ponzi Scheme, Pls.' Opp'n at 1; *see also* Hr'g Tr. 87:15 to 88:17 (identifying the federal district court providing venue relative to plaintiffs' residence). The Pareskys sought to apply their substantial loss to reduce the fictitious amounts of income they reported receiving in tax years 2005 through 2007—via IRS Form 1040X—and to obtain refunds of the amount of tax paid in tax years 2003 through 2007 due to a carryback of Madoff losses from 2008 to those years—via IRS Form 1045. Pls.' Opp'n at 1, 5; Compl. ¶ 5.

Plaintiffs submitted their Forms 1045—relating to applications for tentative refund under I.R.C. § 6411—to the IRS seeking a carryback of their net operating loss on December 31, 2009. Compl. ¶ 9; *see also* Compl. Ex. A (plaintiffs' Forms 1045).[4] The Pareskys allege that the IRS received the Forms 1045 on January 4, 2010, Compl. ¶ 10, but that the IRS records listed them as received on, alternatively, January 6, 2010 (in the initial denial letter it mailed on March 3, 2010), January 28, 2010 (in the IRS's transcripts of the Pareskys' 2006 and 2007 tax files), and, finally, as received but not dated (in the IRS's transcripts of the Pareskys' 2003, 2004, and 2005 tax files), Compl. ¶¶ 12-14; Compl. Exs. B-D. The IRS initially rejected the Pareskys' claims for a carryback because they "had not made their claims under the Safe Harbor of Revenue Procedure 2009-20." Compl. ¶ 15. The Pareskys' accountant informed the IRS that they did not intend to assert their carryback claims under that revenue procedure, *see* Hr'g Tr. 20:11 to 23:10 (discussing the purpose and effect of Revenue Procedure 2009-20), and the IRS accepted this assertion, eventually requesting additional documentation relating to the alternative minimum tax for tax years 2004 through 2006, which the Pareskys' accountant provided on April 2, 2010, Compl. ¶¶ 16-17.

The IRS subsequently issued refunds for each of the tax years for which a Form 1045 carryback was claimed. A refund of $552,202 was issued for 2003 on May 14, 2010. Compl. ¶ 20. A refund in the amount of $3,717,167 for 2004 was issued on April 23, 2010. Compl. ¶ 21. A refund for 2005 in the amount of $974,858 was issued on May 7, 2010. Compl. ¶ 22. The 2006 refund—for $2,899,253—and the 2007 refund—for $1,794,177—were both issued on the same day as the 2004 refund—April 23, 2010. Compl. ¶¶ 23-24. As the Pareskys note, *see* Compl. ¶¶ 20-24, each of these dates is more than 45 days after January 4, 2010.[5]

---

[4]I.R.C. § 6411 addresses "[t]entative carryback and refund adjustments," *id.* (title), and allows taxpayers to seek "a tentative carryback adjustment" of a tax for a prior year "affected by a net operating loss carryback provided in section 172(b), by a business credit carryback provided in section 39, or by a capital loss carryback provided in subsection (a)(1) or (c) of section 1212, from any taxable year," I.R.C. § 6411(a). The statute calls upon the IRS to make a "limited examination" within 90 days after such an application is filed, to "determine the amount of the decrease in the tax attributable to such carryback." I.R.C. § 6411(b). The decrease shall be credited against unsatisfied amounts of tax due or owed, or refunded. *Id.*

"An application for a tentative carryback adjustment does not constitute a claim for credit or refund." 26 C.F.R. § 1.6411—1(b)(2). It can, however, "trigger government liability for overpayment interest." *Coca-Cola Co. v. United States*, 87 Fed. Cl. 253, 257 (2009).

[5]I.R.C. § 6611 provides for interest on overpayments, with an exception set out in Subsection 6611(e), as follows (in pertinent part):

3

IRS records indicate that the refunds were "scheduled," a term that refers to an internal IRS process akin to authorizing the refund, *see* I.R.C. § 6407, shortly after the refunds were paid, *see* Def.'s Mot. at 9; Def.'s Reply in Support of Mot. to Dismiss for Lack of Subject Matter Jurisdiction and Resp. to Pls.' Cross-Mot. to Transfer Venue ("Def.'s Reply") Ex. 2 (Decl. of Benjamin Ray) (explaining and describing the IRS process by which refunds are scheduled), ECF No. 28-2. The government represents that the 2004 through 2007 refunds were scheduled on May 10, 2010, while the 2003 refund was scheduled on May 17, 2010. Def.'s Reply at 21. Usually, the scheduling date for a particular refund is determined by execution of Form 2188 "or its equivalent." Def.'s Reply at 20-21 (citing *Coca-Cola*, 87 Fed. Cl. at 256).[6] Defendant submits, however, that the document retention period for these forms is 6 years and 3 months, and, as a result, the IRS has destroyed the Forms 2188 associated with the Pareskys' refunds. In support of their proffered scheduling date, then, the government submits the declaration of Benjamin Ray, a Program Manager in the IRS's Kansas City, Missouri processing center. *Id.* Ex. 2. Mr. Ray submits that IRS Form 23C is a form that is signed—and thus the associated refunds are scheduled—on the same day as the Forms 2188 with which the particular Form 23C is associated. *See id.* Ex. 2, ¶¶ 21-25. As such, it is the government's position that the Forms 23C—which have a document retention period of 15 years, *see* Hr'g Tr. 27:24-25—are equivalents of the Forms 2188 for purposes of ascertaining the scheduling date of a particular refund, *see* Def.'s Reply at 20-22; *see also id.* Ex. 2, ¶ 23. The government seeks to bolster Mr. Ray's declaration by attaching—and having Mr. Ray explain—the IRS's Individual Master File ("IMF") readout of the Pareskys' accounts. *See id.* ¶¶ 5-12; Def.'s Reply Ex. 3 (the Pareskys' IMF transcripts), and the Pareskys' tax transcripts, *see* Def.'s Reply Ex. 6 (the Pareskys' tax transcripts). The IMFreadont and tax transcripts record the relevant transactions occasioned by the Pareskys' carryback and result in their refunds being scheduled as occurring on the date on which the Forms 23C and, the government represents, the Forms 2188 were signed.

---

> (e) Disallowance of interest on certain overpayments.—
>> (1) Refunds within 45 days after return is filed.—If any overpayment of tax imposed by this title is refunded within 45 days after the last day prescribed for filing the return of such tax (determined without regard to any extension of time for filing the return) or, in the case of a return filed after such last date, is refunded within 45 days after the date the return is filed, no interest shall be allowed under subsection (a) on such overpayment.
>> (2) Refunds after claim for credit or refund.—if—
>>> (A) the taxpayer files a claim for a credit or refund for any overpayment of tax imposed by this title, and
>>> (B) such overpayment is refunded with 45 days after such claim is filed,
>> no interest shall be allowed on such overpayment from the date the claim is filed until the day the refund is made.

I.R.C. § 6611(e)(1), (2).

[6] Form 2188 is entitled "Voucher and Schedule of Overpayment and Overassessment," and is used by the IRS to schedule an abatement of taxes. *See* Def.'s Reply Ex. 2, ¶ 1.

In the intervening years between the Pareskys' receipt of the refunds and their filing suit in this court, the IRS "initiated an examination of [the Pareskys'] tax liability for tax years 2003 through 2008, including the refunds sought in the . . . Form[s] 1045." Pls.' Opp'n at 6 (citing Pls.' Opp'n Ex. B, ¶ 14, ECF No. 18-2 (affidavit of Emily Paul, CPA)). The IRS's examination continued until October 2011, during which time the IRS sought—and plaintiffs agreed to—an extension of the limitations period via Form 872. Pls.' Opp'n at 7. In October 2011, the Pareskys' file was transferred to the IRS's Joint Committee Review Staff for preparation of a report to the JCT, as is required for refunds greater than certain dollar limits. *See* Pls.' Opp'n at 7; *see also* I.R.C. § 6405. The IRS's Joint Committee Review Staff submitted a letter to the JCT on January 25, 2013, stating that the refunds the Pareskys' sought on their Forms 1045 had been approved. *See* Pls.' Opp'n at 7; *see also* Pls.' Opp'n Ex. A (IRS letter to the JCT).

The Pareskys engaged in extensive communication with the IRS throughout 2013 relating to numerous asserted errors in the IRS's processing of refunds arising out of their Forms 1040X. *See* Pls.' Opp'n at 7-8. As they note, *see id.* at 5-6, the refunds associated with the Forms 1040X are not themselves at issue here. Rather, the numerous communications, allegedly erroneous or excessive refunds, and negotiations relating to the return or use of the allegedly excessive refunds to offset the Pareskys' interest claims, form a background for the Pareskys' extensive attempts over several years to work with the IRS to ensure the proper processing of their refund claims. *See id.* at 8-10. The problems associated with the Pareskys' Forms 1040X included an incorrect calculation of overpayment interest owed for tax year 2005, the determination that the amount of a refund due for tax year 2006 was actually tax owing and the assessment of penalties on that amount, and a refund of twice the amount actually due for tax year 2007. *See id.* at 8. The Pareskys assert that, in the aggregate, the excessive refund associated with their 2007 Form 1040X totaled the full amount they claimed on both the Forms 1040X and the overpayment interest on the Forms 1045. *Id.* at 8-9. On the IRS's insistence and the advice of the Office of the Taxpayer Advocate, the Pareskys "paid back a significant portion of the amounts received on May 6, 2013, holding back only the refund claimed in their Form 1040X for tax year 2007 and the additional interest owed on the refund issued with respect to their Form 1040X for tax year 2005." *Id.* at 9.

The Pareskys also attempted to secure the sums to which they assert they are entitled by filing a protest with the IRS on June 6, 2014. Pls.' Opp'n at 9. The IRS determined, on September 4, 2014, that no overpayment interest was due on the Pareskys' Forms 1045 because they "did not file IRS Forms 6251 for tax years 2004 through 2006 with the initial filing of the Form 1045,"[7] and thus the refunds were in fact processed within 45 days of when the Forms 1045 were submitted with all necessary information—*i.e.,* when the Forms 1045 were submitted in processible form. *See id.* at 10. Plaintiffs dispute the IRS's assertion that their Forms 1045 were processible only upon submission of further supporting documents on April 2, 2010. *See* Compl. ¶¶ 12, 15-18. They argue that "[t]he Forms 6251[, pertaining to the alternative minimum tax, requested by an IRS official] were not required because they were not necessary to the processing of the" Forms 1045, citing the Paperwork Reduction Act of 1995 and a report of the Treasury Inspector General for Tax Administration. *See* Compl. ¶¶ 17-18.

---

[7]Form 6251 is entitled "Alternative Minimum Tax—Individuals," and is used by individuals to compute any alternative minimum tax that may be due for a given tax year.

5

Following the denial of their protest on September 4, 2014, the Pareskys were instructed to "file a 'formal claim on Form 843, Claim for Refund and Request Abatement by September 12, 2014,'" which they did. Pls.' Opp'n at 10 (citing Pls.' Opp'n Ex. C, ¶¶ 15, 17, ECF No. 18-3 (Affidavit of Edward L. Glazer)). On September 24, 2015, the Pareskys' claim on Form 843 was likewise denied. Pls.' Opp'n at 9-10. The IRS's letter denying that claim contained language that "expressly indicated that [the Pareskys] could file suit within two (2) years after the letter was mailed, consistent with I.R.C. § 6532(a)(1)." *Id.* (citing, *inter alia*, Glazer Affidavit ¶¶ 21-22). Plaintiffs filed their Complaint in this court on September 15, 2017, within the specified two-year period. *See generally* Compl.

## STANDARDS FOR DECISION

Two different, divergent, and conflicting jurisdictional paths have been proffered by the parties. One, favored by the Pareskys, would apply the detailed regime provided by the I.R.C. for tax refund suits. The other, urged by the government, looks to the jurisdictional requisites of the Tucker Act and the statute of limitations pertinent to suits under that Act.

### A. *Refund Suits Governed by the Internal Revenue Code*

I.R.C. § 6532 provides, in relevant part, that "[n]o suit or proceeding under section 7422(a) for the recovery of any internal revenue tax, penalty, or other sum, shall be begun . . . after the expiration of 2 years from the date of mailing . . . by the Secretary to the taxpayer of a notice of the disallowance of the part of the claim to which the suit or proceeding relates." I.R.C. § 6532(a)(1). Correlatively, Section 7422(a) provides that a taxpayer may not maintain suit in "any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary." I.R.C. § 7422(a).

As to when a claim is duly filed, the I.R.C. "sets forth its time limitations in unusually emphatic form." *United States v. Brockamp*, 519 U.S. 347, 350 (1997). In contrast with other "limitations statutes [that] use fairly simple language, which one can often plausibly read as containing an implied 'equitable tolling' exception," Section 6511, the portion of the I.R.C. that supplies the rules for when claims for refunds of taxes paid are timely filed, "sets forth its limitations in a highly detailed technical manner, that, linguistically speaking, cannot easily be read as containing implicit exceptions. Moreover, [it] reiterates its limitations several times in several different ways." *Id.* at 350-51. In short, because "[t]ax law . . . is not normally characterized by case-specific exceptions reflecting individualized equities," "Section 6511's detail, its technical language, the iteration of the limitations in both procedural and substantive forms, and the explicit listing of exceptions, taken together, indicate . . . that Congress did not intend courts to read other unmentioned, open-ended, 'equitable' exceptions into the statute." *Id.* at 352. Within this framework, a "claim for refund or credit" is generally considered "duly filed" when it is "filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid." I.R.C. § 6511(a).

At bottom then, for a claim "for the recovery of any internal revenue tax, penalty, or other sum," I.R.C. § 6532, to be cognizable in this court, a plaintiff must show two things: first, that the claim was timely made to the IRS, and, second, in relevant part, that the suit in this court

6

was filed within two years after the IRS denied the plaintiff's administrative claim, I.R.C. §§ 6511, 6532, 7422.

### B. *Suits for Money Damages Under the Tucker Act*

The Tucker Act provides this court with jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). For claims within this jurisdictional grant, a statute of limitations provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. The six-year statute of limitations specified in Section 2501 is a jurisdictional requirement in this court. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008). And, because of its jurisdictional nature, the six-year limitations period is not susceptible to equitable tolling or any of the other doctrines that would excuse a claim that was untimely under a non-jurisdictional statute of limitations. *Id.* at 134.

Even so, there is a solitary ground on which an otherwise untimely claim will nevertheless be within the jurisdiction of this court. Known as the "accrual suspension rule," "the accrual of a claim against the United States will in some situations be suspended when an accrual date has been ascertained, but the plaintiff does not know of the claim." *Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009) (*citing Japanese War Notes Claimants Ass'n v. United States*, 373 F.2d 356, 358-59 (1967)). The accrual suspension rule "is strictly and narrowly applied," *Ingrum*, 560 F.3d at 1315, and "[t]o achieve such suspension[,] the plaintiff 'must either show that the defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was "inherently unknowable" at the accrual date,'" *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008) (*citing Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (*in turn quoting Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir. 1985))).

### C. *Transfer under 28 U.S.C. § 1631*

28 U.S.C. § 1631 provides that "[w]henever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed[,] . . . and the action . . . shall proceed as if it had been filed in . . . the court to which it is transferred on the date upon which it was actually filed in . . . the court from which it is transferred." 28 U.S.C. § 1631. As this language indicates, the three principal requirements for granting a motion to transfer under Section 1631 are that: (1) the transferring court finds it lacks jurisdiction; (2) the proposed transferee court is one in which the case could have been brought at the time it was filed; and (3) the transfer is in the interest of justice. *Jan's Helicopter Serv., Inc. v. Federal Aviation Admin.*, 525 F.3d 1299, 1303 (Fed. Cir. 2008) ("A case may be transferred under [S]ection 1631 only to a court that has subject matter jurisdiction.") (citing *Souders v. South Carolina Pub. Serv. Auth.*, 497 F.3d 1303, 1307 (Fed. Cir. 2007)).

## ANALYSIS

### I. TIMELINESS

The government's principal argument in support of its motion to dismiss is that the Pareskys' claims to overpayment interest are not properly before this court because they were filed outside the statute of limitations governing their claims. Def.'s Mot. at 1. Central to this contention are the dual assertions that, first, the Pareskys' claims are governed by the general six-year statute of limitations applicable to cases within this court's Tucker Act jurisdiction, and, second, that the Pareskys' claims accrued more than six years before the day on which they filed their complaint in this case. *Id.*

The Pareskys marshal several arguments as to why the government's contention must fail, including: (1) that the relevant statute of limitations is not the Tucker Act's six-year period but, instead, that provided in Section 6532 of two years from the date of mailing of the IRS's denial of plaintiffs' claims; (2) that, if the six-year limitations period does apply, it began to run on January 25, 2013; and (3) that, if the limitations period is held to have started running on the government's proffered dates of May 10 and 17, 2010, that their claims are nevertheless timely because the accrual suspension rule operates here to delay the accrual of their claims (and the corresponding beginning of the limitations period) until, again, January 25, 2013 as a result of what plaintiffs assert is the government's "concealing when [p]laintiffs' overpayment refunds [were] scheduled." Pls.' Opp'n at 18-19; *see also generally id.* Each of these arguments is taken in turn.

#### A. *Which Statute of Limitations Applies?*

The Pareskys argue that the statute of limitations applicable to their claims here is the two-year period provided in Section 6532 rather than the Tucker Act's six-year provision. *See* Pls.' Opp'n at 19-26. This is so, they contend, because a claim for overpayment interest is a claim for "the recovery of . . . [a] sum alleged to have been excessive or in any manner wrongfully collected." Pls.' Opp'n at 20 (citing I.R.C. § 7422(a)). To support this interpretation, the Pareskys cite *Pfizer, Inc. v. United States*, No. 16 Civ. 1870 (LGS), 2016 WL 6902196 (S.D.N.Y. Oct. 3, 2016), *appeal docketed*, No. 17-2307 (2d Cir. Mar. 11, 2016), a case that refers to Black's Law Dictionary for definitions of the words "recovery" and "sum," and the Sixth Circuit's decision in *E.W. Scripps Co. v. United States*, 420 F.3d 589 (6th Cir. 2005). Pls.' Opp'n at 20-21. *Scripps* likewise analyzed the language of Section 7422 and concluded that it included claims for overpayment interest because "[i]f the [g]overnment does not compensate the taxpayer for the time-value of the tax overpayment, the [g]overnment has retained more money than it is due, *i.e.,* an 'excessive sum,'" 420 F.3d at 597. These decisions, the Pareskys argue, are persuasive evidence of the proper reading of Section 7422 and result in the application of the limitations period of Section 6532 to their claims.

The government disputes this proffered interpretation, citing precedent from the Federal Circuit, the Court of Claims, this court, and various secondary and administrative materials. *See* Def.'s Mot. at 5-7; Def.'s Reply at 5-12. It first asserts that Section 6532's "any sum" language is best viewed, in accordance with the canon of *noscitur a sociis,* as including claims similar in type to the other two items Section 6532 lists, and thus submits that Section 6532 covers only claims seeking return of sums the plaintiff has paid over to the government. *See* Def.'s Reply at

8

15. This analysis is important to the resolution of the government's motion to dismiss because, as a decision by the Court of Claims conceived it, this court's predecessor's—and, accordingly, this court's—jurisdiction over claims for money basically comprises two categories: "those in which the plaintiff has paid money over to the [g]overnment, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967), *abrogated in part on other grounds by Malone v. United States*, 849 F.2d 1441, 1444-45 (Fed. Cir. 1988). As the court noted, tax refund suits are examples of cases in which "the plaintiff has paid money over to the [g]overnment . . . and seeks return of all or part of that sum." *Id.*; s*ee also Hinck v. United States,* 64 Fed. Cl. 71, 75 (2005), *aff'd*, 446 F.3d 1307 (Fed. Cir. 2006), *aff'd*, 560 U.S. 501 (2007).

A series of decisions stands for the proposition that overpayment interest, unlike underpayment interest and tax refunds themselves, are *not* treated like so-called "illegal exaction" claims, but instead fall into the second category delineated by *Eastport S.S. Corp.*, *i.e.*, sums to which the claimant is entitled to be paid by the government. In *Alexander Proudfoot*, the Court of Claims noted that overpayment interest "is paid by the United States, not as a refund of interest previously paid by the taxpayer on demand of the [IRS], but simply because the [g]overnment has had the use of money found to belong to the taxpayer." 454 F.2d 1379, 1384 (Ct. Cl. 1972). Earlier, in *Barnes v. United States*, 137 F. Supp. 716, 718 (Ct. Cl. 1956), the Court of Claims had held that overpayment interest is subject to the court's six-year statute of limitations because "[a] statute of limitations on a suit for interest is not specifically covered by the Internal Revenue Code." *Barnes* was foreshadowed by *Colgate-Palmolive-Peet Co. v. United States*, 58 F.2d 499, 502 (Ct. Cl. 1932), in which the court stated that "[w]e think it clear under the statute that, whenever the claim for refund was allowed, the statute of limitations [for interest] began to run." To the same effect is *General Electric Co. v. United States*, 384 F.3d 1307, 1312 (Fed. Cir. 2004), where the Federal Circuit held that "the statute of limitations for collecting interest on an overpayment is not the three-year limitations period applicable to recovery of the overpayment itself, but the general six-year statute that applies to suits against the government." *Id.* A series of decisions of this court also hold that overpayment interest claims are governed by the Tucker Act's general statute of limitations, rather than those provided by the I.R.C. *See, e.g., Ford Motor Co. v. United States,* 132 Fed. Cl. 104, 110 (2017), *appeal docketed*, No. 2017-2360 (Fed. Cir. July 31, 2017); *Coca-Cola Co.,* 87 Fed. Cl. at 255-56 (2009); *Four Star Oil & Gas Co. v. United States*, 49 Fed. Cl. 755, 760 (2001), *modified on reh'g*, 51 Fed. Cl. 110 (2001); *General Instrument Corp. v. United States*, 33 Fed. Cl. 4, 6 (1995).

The Pareskys' primary response to these authorities is, on the one hand, that the I.R.C. in effect at the time of the Court of Claims opinion in *Barnes* was substantively different from that version of the I.R.C. that governs the Pareskys' claims, *see* Hr'g Tr. 56:12-16, and, in any event, that *Barnes* is "an ill-advised opinion and . . . some of the other opinions by the Sixth Circuit really do a better job of interpreting the actual statute, [Section] 7422, and similar statutes in a better light," Hr'g Tr. 56:17-22. They further submit that the statements in *Alexander Proudfoot* on which the government relies are dicta, *see* Pls.' Opp'n at 23-24, and, accordingly, that the remaining Federal Circuit precedents, and the cases from this court that construe overpayment interest claims as arising under the Tucker Act's six-year statute of limitations rest on an infirm foundation and should not be followed here, Pls.' Opp'n at 23-25.

9

The Pareskys' arguments regarding *Barnes* and *Alexander Proudfoot* should be addressed to the Federal Circuit. This court "may not deviate from the precedent of the United States Court of Appeals for the Federal Circuit any more than the Federal Circuit can deviate from the precedent of the United States Supreme Court." *Crowley v. United States*, 398 F.3d 1329, 1335 (Fed. Cir. 2005); *see also Strickland v. United States*, 423 F.3d 1335, 1338 & n.3 (Fed. Cir. 2005) ("[A] trial court may not disregard its reviewing court's precedent . . . [with] two narrow exceptions: if the Federal Circuit's precedent is expressly overruled by statute or by a subsequent Supreme Court decision[;] . . . [o]therwise a circuit court decision, if applicable, controls until the circuit court overrules it en banc.") (internal citations omitted). Notwithstanding the circuit split on this issue, the law in this circuit is that claims for overpayment interest are claims arising under the provisions of the Tucker Act's general jurisdictional grant, and are thus subject to the Tucker Act's six-year statute of limitations. *See General Elec.*, 384 F.3d at 1312. In short, unless and until the Federal Circuit revisits the holdings in *Barnes* and its progeny and overrules them, plaintiffs' arguments on this point must fail.

### B. Was the Pareskys' Complaint Filed within Six Years of Accrual?

Because the Pareskys' claims in this court arise under the Tucker Act's jurisdictional provisions, for their claims to be timely before this court they can have accrued no earlier than September 15, 2011, six years prior to the filing of their complaint. The government asserts that the Pareskys' claims would have accrued no later than on May 10 and 17, 2010, because these are the dates on which the IRS "scheduled" the Pareskys' refunds. *See* Def.'s Mot. at 8-9.

The government's argument on this point begins from the precept that "[a] claim first accrues when all the events have occurred that fix the alleged liability of the government and entitle the claimant to institute an action," *Ingrum v. United States,* 560 F.3d 1311, 1314 (Fed. Cir. 2009); *see also Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988) (same), and continues with reference to *Barnes*, which states that "the cause of action for interest accrues on the date of the allowance of the credit," 137 F. Supp. at 719. For purposes of ascertaining when a credit is "allowed," *Barnes* cites to a provision of the then-operative version of the I.R.C., *see id*. at 718 (citing 26 U.S.C. § 3777(a) (1939)), which has its equivalent in what is now Section 6407. Section 6407 provides that "[t]he date on which the Secretary first authorizes the scheduling of an overassessment in respect of any internal revenue tax shall be considered as the date of allowance of refund or credit in respect of such tax." I.R.C. § 6407; *see also* 26 C.F.R. § 301.6407-1 (providing that "[t]he date on which the district director or the director of the regional service center, or an authorized certifying officer designated by either of them, first certifies the allowance of an overassessment in respect of any internal revenue tax shall be considered as the date of allowance of refund or credit in respect of such tax").

In short, under the government's framing, the Pareskys' claims for overpayment interest accrued when "all events had occurred that fix the alleged liability of the government," *Ingrum,* 560 F.3d at 1314, and this took place when a claim was "allowed," which, by statute and regulation, occurred when the claim was "scheduled."

The Pareskys do not disagree that the law provides that a claim accrues when allowed and is allowed when scheduled, *see* Pls.' Opp'n at 12, and they also agree that the scheduling generally takes place "on the date an authorized official signed the" Forms 2188. *Id.* at 13 (citing *Coca-Cola Co.*, 87 Fed. Cl. at 256). The scope of the parties' disagreement is

10

accordingly a narrow one: given that the IRS apparently has destroyed the Forms 2188 as a result of its 6-year, 3-month retention period, the parties dispute what evidence is sufficient to establish when their claims were scheduled. *See Coca-Cola Co.,* 87 Fed. Cl. at 256 ("[P]laintiff's claim for statutory interest likely accrued, and therefore, the statute of limitations began to run, on the date an authorized official signed the scheduling (*e.g.,* Form 2188 or its equivalent).") (internal quotations and footnotes omitted).

The government asserts that the Ray Declaration and the documents that are appended to it are sufficient to establish that the Forms 2188 would have been signed—and, accordingly, that the Pareskys' refunds were scheduled—on, alternatively, May 10, 2010 (for 2004-2007) and May 17, 2010 (for 2003). Def.'s Reply at 20-24; Def.'s Reply Exs. 2-6.[8] In contrast, the Pareskys propose that the appropriate scheduling date was January 25, 2013, the day on which the IRS submitted a letter to the JCT that noted that "[t]he above overassessments are approved." Pls.' Opp'n Ex. A, at 4 (IRS letter to JCT), *see also* Pls.' Opp'n at 16-17.[9]

The Pareskys contend that the government's evidence, *viz.*, the Ray Declaration, the Forms 23C, the IMF printout, and the Pareskys' tax transcripts, are unreliable indicators of when the refunds were scheduled because the references to Transaction Code 295 in those documents are too abstracted from the allowance of the refunds, *see* Pls.' Reply Br. in Support of Pls.' Mot. to Transfer ("Pls.' Reply") at 8, ECF No. 31. that the Ray Declaration is an unreliable indicator of IRS practices generally and does not establish that those practices were followed in the Pareskys' case, and, finally, that a 2009 report by the Treasury Inspector General for Tax Administration casts doubt on the government's proffered evidence because the refunds at issue

---

[8]It is undisputed that the Pareskys filed their Forms 1045 on December 31, 2009 seeking refund of taxes taking into account the carryback of their net operating losses. *See* Hr'g Tr. 19:22 to 20:3. It is further undisputed that the IRS paid refunds on the Pareskys' Forms 1045 on May 17, 2010 (for tax year 2003), May 10, 2010 (for tax year 2005), and April 23, 2010 (for tax years 2004, 2006, and 2007). *See* Def.'s Mot. at 3; Compl. ¶¶ 20-24. The parties dispute whether the Pareskys' Forms 1045 were submitted in "processible" form on December 31, 2009, or whether it was not processible until the later point when the Pareskys submitted additional documentation requested by the IRS. *See* Hr'g Tr. 20:3 to 24:2; Compl. ¶¶ 17-18. If the Forms 1045 were not in processible form until March or April 2010, *see* Compl. ¶¶ 16-18; Hr'g Tr. 23:19 to 24:2, then the IRS would have issued refunds within 45 days of the submission of a processible claim for credit or refund, and thus no overpayment interest would be owed, *see* I.R.C. § 6611(e)(2), (f)(1). The parties' dispute as to whether the Forms 1045 were processible in December 2009 or March or April 2010 does not bear on the timeliness of the Pareskys' complaint under Section 2501.

[9]While plaintiffs assert that January 25, 2013 is "the earliest moment where it is certain that the IRS allowed Plaintiffs' claims for refunds," and make repeated references to the fact that the individual that signed the letter to the JCT is "an IRS manager," Pls.' Reply at 17, they do not attempt to assert that Richard Kaczmarek, apparently a Team Manager with the IRS's Large Business and International Division and the signatory to the letter sent to the JCT, Pls.' Opp'n Ex. A at 1, 4, is either a "district director[,] the director of the regional service center, or an authorized certifying officer designated by either of them," whose certification of "the allowance of an overassessment . . . shall be considered as the date of allowance," 26 C.F.R. § 301.6407-1, for purposes of I.R.C. § 6407.

11

here were manually entered and the government's electronic records "were [allegedly] often inaccurate and unreliable." *See id.* at 7-14. The Pareskys also assert that an adverse inference is warranted as a result of the apparent destruction of the Forms 2188. *See id.* at 15-16 (citing *United Med. Supply Co. v. United States*, 77 Fed. Cl. 257, 263 (2007)).

In contrast, the government contends that the date proffered by the Pareskys is inapposite to the question of when their refunds were scheduled because, it claims, the JCT reporting requirements with which the IRS is required to comply, *see* I.R.C. § 6405(a), (b), have no bearing on when a tentative refund is "allowed." *See* Def.'s Reply at 24-25; *see also* I.R.C. § 6405(b) ("Any credit or refund allowed or made under [S]ection 6411 shall be made without regard to the provisions of [S]ubsection (a)," which prohibits making any refund or credit above certain dollar limits without first submitting a report to the JCT.).

The government further asserts that *Barnes* answers the plaintiffs' assertions on their own terms. In *Barnes*, the plaintiff's refund was of an amount for which the then-operative version of what is now Section 6405(a) provided that no refund could issue until 30 days after the submission of the report to the JCT. *See Barnes*, 137 F. Supp. at 718; I.R.C. § 6405(a). The plaintiff argued that "since the Commissioner could not refund or credit the overpayment until 30 days after the submission of the report to the Joint Committee, its cause of action for the interest did not accrue until that time." *Barnes*, 137 F. Supp. at 718. The court rejected that argument, holding that "[w]hen the Commissioner si[gn]ed the schedule of overassessments . . . , plaintiff's credit was allowed and its cause of action for interest due on this credit matured and accrued at that time. . . . The submission of the report to the Joint Committee was not intended to and does not suspend the plaintiff's right to sue for the interest." *Id.* at 718-19 (internal citation omitted).

Finally, in response to the Pareskys' arguments about the lack of evidence for when the IRS scheduled their refunds by signing the Forms 2188, the government asserts that the Forms 23C, the IMF and tax transcripts, and the Ray Declaration are a sufficiently complete suite of documents to establish the date on which the Pareskys' refunds were allowed, distinguishing this case from *Parker Hannifin*, cited by plaintiffs as an example of when the government's "proof on when the IRS allowed" refunds was insufficient. *See* Def.'s Reply at 22-23 (citing *Parker Hannifin Corp. v. United States*, 71 Fed. Cl. 231, 235 (2006)); *but see* Pls.' Reply at 9-14 (discussing *Parker Hannifin*).

The court notes that the Pareskys do not allege, and it does not appear factually correct, that the signatory of the letter to the JCT was a person who had the authority to "schedule" their refunds. *See* 26 C.F.R. § 301.6407-1. The letter to the JCT does not state when an authorized individual allowed the Pareskys' refunds, and because it is not evident that the signatory himself was an authorized individual, any argument that the letter constitutes an "allowance" of their refunds must fail as not constituting an equivalent to a signed Form 2188.

The inquiry, then is whether the government has satisfactorily established that the proper dates of scheduling are May 10 and 17, 2010. In *Parker Hannifin*, the court declined to accept an affidavit by an IRS employee as evidence of the date the plaintiff's refund had been scheduled because, while "[c]ourts will permit the IRS to prove the content of a destroyed document, such as Form 2188, through evidence of the normal practices of [the] IRS, . . . [d]efendant must offer some reliable evidence to the [c]ourt establishing the date on which the Form 2188 was signed." *Parker Hannifin*, 71 Fed. Cl. at 235-36 (internal citations omitted).

The affidavit there, *see Parker Hannifin Corp v. United States*, Case No. 05-1041T, ECF No. 17-1 (Apr. 26, 2006), provided evidence of the IRS's general practice, *see, e.g., id.* at 4-5 ("[T]he Form 2188 . . . for [the] cycle . . . [at issue] would have been pulled on February 19, 1999, and signed on the following Monday."), and attached the Business Master File printout for Parker Hannifin, *see id.* at 6-8. But the court concluded that this evidence was insufficient to "confirm that [the affiant's] statement [as to when the Form 2188 would have been signed] is correct," and, "[w]ithout more, the [c]ourt cannot find that the Form 2188 actually was signed" on the date the affiant asserted. *Parker Hannifin*, 71 Fed. Cl. at 236.

Here, the court finds that the Ray Declaration does not suffer from the same deficiencies as those in *Parker Hannifin.* In addition to providing a more complete statement of normal IRS procedure and attaching the Pareskys' IMF printouts—explaining them in far greater detail—the Ray Declaration also includes the Pareskys' tax transcripts and the Forms 23C that, Mr. Ray indicates, are signed alongside the Forms 2188 for a particular account period. *See generally* Def.'s Reply Exs. 2-4. Taken as a whole, the court concludes that the government's submission, though failing to replace the Forms 2188 that were destroyed, provides sufficiently detailed indicia of the IRS's business records indicating the dates on which the assertedly-relevant transaction codes were entered and documents were signed to establish the date on which the Pareskys' refunds were scheduled and, accordingly, when their claims for overpayment interest accrued. Notably also, the burden of establishing jurisdiction rests on the plaintiffs, as "[a] plaintiff must establish jurisdiction by a preponderance of the evidence." *Parker Hannifin*, 71 Fed. Cl. at 234 (internal citations omitted). Compared to the government's evidence in and supporting the Ray Declaration, the Pareskys have a weaker factual basis for their assertion that a letter from the IRS to the JCT suffices when that letter does not indicate a date on which the refunds were allowed and is not signed by an official that has plausibly been alleged to be an authorized scheduling official.

The Pareskys ask the court to weigh in the balance of evidence that the destruction of the Forms 2188 by the government warrants an adverse inference on the question of when their refunds were scheduled. *See* Pls.' Reply at 15-16; Hr'g Tr. 74:17 to 75:20. An adverse inference, the "oldest and most venerable remedy" for the spoliation of evidence, *see United Med. Supply*, 77 Fed. Cl. at 263, stems from the court's "inherent power to control the judicial process and litigation," *id.*, and generally has been held to require the party seeking an adverse inference show three things: "(1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the records were destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense," *see, e.g., Jandreau v. Nicholson*, 492 F.3d 1372, 1375 (Fed. Cir. 2007) (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir. 2002) (internal alterations omitted); *accord*, *e.g., Consolidated Edison Co. of N.Y., Inc. v. United States*, 90 Fed. Cl. 228, 254-56 (2009), *rev'd on other grounds*, 703 F.3d 1367 (Fed. Cir. 2013).

Specifically, the Pareskys assert that the destruction of the Forms 2188 by the IRS warrants an adverse inference that the dates on which their refunds were scheduled were not in May 2010, as the government submits. Yet, beyond citing the general principle from *United Medical Supply*, the Pareskys do not discuss any of the factors relevant to determining if such an inference is warranted beyond the bare assertion that the documents were destroyed. While it is

13

evident that the IRS would have been better served to preserve the Forms 2188 longer than they did, the Pareskys have made no argument that the IRS was under a specific duty to preserve the Forms 2188 when they were destroyed, and the Pareskys have further made no allegations as to culpability attendant to such destruction.  Accordingly, the court declines to draw an adverse inference of the type the plaintiffs seek.  It is indeed unfortunate that the destruction of the Forms 2188 has "led us to all sorts of complicated factual issues," Hr'g Tr. at 108:20-21, but the court declines to adopt a rule that "require[s] the [g]overnment to use Form 2188, and *only* Form 2188, to prove the date the IRS scheduled the overassessments," Def.'s Reply at 21 (emphasis in original), under penalty of adverse inference.

### C. Does the Accrual Suspension Rule Apply?

The final argument the Pareskys muster as to why their claims are timely even if the Tucker Act's six-year limitations period applies and began to run on the government's proffered dates in May 2010 is that the accrual suspension rule operates to delay accrual of their causes of action until January 25, 2013, because, *inter alia*, of "the IRS's failure to disclose when it scheduled the overassessments claimed by [the Pareskys] . . . [and, accordingly, the Pareskys] were deprived of knowledge of when their claims accrued."  Pls.' Opp'n at 3.  The Pareskys assert that application of the accrual suspension doctrine is warranted because the IRS "has concealed its acts with the result that [the Pareskys] were unaware of their existence."  *See* Pls.' Opp'n at 17-19 (citing *Ingrum,* 560 F.3d at 1315).  The Pareskys contend that this argument for application of the accrual suspension doctrine must be weighed in conjunction with the extensive history between the Pareskys and the IRS related to the examination and eventual allowance of their applications for adjustments to their tax filings on Forms 1040X and 1045.  *See* Pls.' Opp'n at 18-19.

The government counters that application of the accrual suspension doctrine is not warranted here because "the [g]overnment did not conceal its non-payment of interest from plaintiffs," and the extensive negotiations between the IRS and the Pareskys is immaterial because "[w]here, as here, an administrative process is permissive rather than mandatory, the pursuit of administrative remedies does not toll the statute of limitations."  Def.'s Reply at 2.

On the facts as the Pareskys allege them, the Pareskys have not met their burden of establishing that the accrual suspension rule applies.  The fact that they did not receive interest on the overpayment refunds they received, as well as the fact that the refunds were received more than 45 days from the date on which the Pareskys believed they filed processible returns, should have given them notice that they had a potential claim to interest.  It cannot be said that this is a case in which the IRS "has concealed its acts with the result that plaintiff was unaware of their existence"—the IRS's "acts" in this instance were the payment to the Pareskys of amounts less than those to which the Pareskys claimed entitlement, and thus if anyone were in a position to gain knowledge of a potential claim, it is they.  On the record as it stands before the court, the accrual suspension doctrine's application is not warranted.

Because timeliness of claims under the Tucker Act and 28 U.S.C. § 2501 is jurisdictional, the court has no judicial power over the Pareskys' claims.

## *II.  TRANSFER*

In light of the pending question about timing and jurisdiction, the Pareskys filed a cross-motion for transfer of the case to the United States District Court for the Southern District of Florida.[10]  As noted *supra*, at 7, in ruling on a motion to transfer, the primary inquiry has three parts: (1) this court must lack jurisdiction; (2) the transferee court must be one in which the plaintiffs could have filed their suit on the day they filed in this court; and (3) such transfer must be in the interests of justice.  If the Pareskys can make this showing, then their case "shall proceed as if it had been filed in . . . the court to which it is transferred on the date upon which it was actually filed in" this court.  28 U.S.C. § 1631.

The first element of the transfer inquiry has been satisfied—this court lacks jurisdiction over the Pareskys' claims.  The next question, however, is whether the District Court for the Southern District of Florida would have had jurisdiction over the Pareskys' claims if they had been filed there on September 15, 2017.  This inquiry is complicated by the parties' larger argument as to the effect of concluding that the Pareskys' claims are governed by and untimely under the jurisdictional of the Tucker Act.  Although there is the split in the circuits over whether a claim for overpayment interest arises under the I.R.C. or is a claim for money against the United States, the parties have agreed that the Eleventh Circuit and the District Court for the Southern District of Florida have not reached any decisions on that question.  *See* Def.'s Supplemental Brief in Support of Motion to Dismiss and in Response to Plaintiffs' Cross-Motion to Transfer Venue ("Def.'s Suppl. Brief") at 10 & n.7, ECF No. 44 (citing no precedent for how claims for overpayment interest are construed in the Eleventh Circuit); *see generally* Pls.' Suppl. Br. (same).

The government asserts that it is "logically fallacious for the [c]ourt to hold both: (1) that it lacks subject matter jurisdiction on the ground that an overpayment-interest claim is *not* a refund claim and is subject to the Tucker Act's six-year statute of limitations; and (2) that the transferee court has subject matter jurisdiction on the ground that an overpayment-interest claim *is* a refund claim over which that court would have jurisdiction under 28 U.S.C. § 1346(a)(1)."  Def.'s Suppl. Brief at 10 (emphasis in original).  The government argues that "the [c]ourt may not transfer the case unless it affirmatively 'determine[s]' that 'the transferee court possesses jurisdiction.'"  *Id*. at 8 (citing *Fisherman's Harvest, Inc., v. PBS & J*, 490 F.3d 1371, 1374 (Fed. Cir. 2007)).

In framing the inquiry as it has, the government omits reference to the text of the statute that authorizes transfers.  While courts applying that statute have framed the inquiry as one of determining whether the transferee court has jurisdiction, what this means in functional terms, and, indeed, what the statute actually says, is that transfer is only proper "to any other such court in which the action . . . *could have been brought at the time it was filed*."  28 U.S.C. § 1631 (emphasis added); *see United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1374-77 (Fed. Cir. 1983) (applying the "could have been brought" text to affirm a transfer of a case to a district

---

[10]The Pareskys initially sought transfer to the District of Massachusetts, but at the hearing held on June 20, 2018, the court requested the parties to submit supplemental briefs and to narrow their focus on the possibility of transfer to the Southern District of Florida, given the Pareskys' current residence.  *See* Hr'g Tr. 86:8 to 88:17, 99:1-9.

15

court by a judge of this court); *see also Federal Home Loan Bank of Boston v. Moody's Corp.*, 821 F.3d 102, 114-119 (1st Cir. 2016) (giving the text of Section 1631 a "broad construction" that "furthers the salutary policy favoring the resolution of cases on the merits") (in latter respect quoting S. Rep. No. 97-275 at 11 (1982), *reprinted in* 1982 U.S.C.C.A.N. 11, 21)), *abrogated on other grounds by Lightfoot v. Cendent Mortg. Corp.* ___ U.S. ___, 137 S. Ct. 553 (2017);[11] *Britell v. United States*, 318 F.3d 70, 73-74 (1st Cir. 2003) (holding that Section 1631 creates a presumption in favor of transfer rather than dismissal in cases where a court determines it lacks jurisdiction, to protect litigants from procedural errors that would otherwise prevent cases from being resolved on the merits). The question is not one of whether the Pareskys' claims are arising under one provision of law in this court and definitively arising under a wholly different provision in a different court. The split in the circuits on the jurisdictional issue bears strongly on this analysis. The question is whether the Pareskys *could have brought* their claims in the Southern District of Florida in the first place. Given that neither party has pointed to precedent that resolves how the Eleventh Circuit or the Southern District of Florida would address jurisdiction over claims for overpayment interest, it is not evident to the court that the Pareskys could *not* have filed their claims for overpayment interest in the District Court for the Southern District of Florida under the I.R.C. and asserted the interpretation of the jurisdictional statutes that it proffers here. Transfer has been denied where the proposed transferee court had previously expressly held that it lacked jurisdiction over the particular type of claim involved. *See Charles v. Rice*, 28 F.3d 1312, 1322-2 (1st Cir. 1994); *Little River Lumber Co. v. United States*, 7 Cl. Ct. 492, 494-95 (1985); C*f. Dancy v. United States*, 668 F.2d 1224, 1227 (Ct. Cl. 1982) (transfer denied where district court would be without jurisdiction to hear the claim). It is not the court's task in ruling on a motion for transfer to itself reach a tentative decision about how the district court might rule on that point, and it is not, as the United States urges, this court's duty to apply Federal Circuit precedent as somehow binding on the Southern District of Florida. *Cf.* Def.'s Suppl. Brief 9-10. The court must simply resolve the legal question whether the Pareskys could have filed their claims in the Southern District of Florida on September 15, 2017, and, following the limited review of their case that 28 U.S.C. § 1631 contemplates, the court determines that they could have. *Cf. Jan's Helicopter Serv.*, 525 F.3d at 1305-07 (undertaking an inquiry into whether the transferee court had jurisdiction to address the merits).[12]

---

[11]The opinion in *Federal Home Loan Bank* notes that Section 1631 was enacted as part of the Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, 96 Stat. 25, which Act among other things established the United States Court of Appeals for the Federal Circuit and this court. In *Federal Home Loan Bank* the First Circuit undertook an extensive examination of the statutory text of Section 1631 in light of the genesis for its enactment and Congress' choice of the language it employed to achieve its purpose.

[12]In *Jan's Helicopter Service*, the majority opinion suggested that before entering a transfer order under Section 1631, the transferor court must affirmatively and definitely find that the transferee court would have jurisdiction. See 525 F.3d at 1303 ("A case may be transferred under [S]ection 1631 only to a court that has subject matter jurisdiction.") (citing *Souders*, 497 F.3d at 1307). In neither *Jan's Helicopter Service* nor *Souders*, however, did the Federal Circuit have before it a circumstance in which there was a split in the circuits on the salient issue of subject matter jurisdiction, and obviously this court cannot answer in any definitive way whether the District Court for the Southern District of Florida and the Eleventh Circuit would adopt the jurisdictional rationale of *E.W. Scripps* on the one hand, or that of *Barnes* and *Alexander Proudfoot* on the other.

16

This is not to say that they will eventually prevail in asserting their preferred interpretation of the I.R.C., for that is not the question occasioned by the transfer statute, but simply that the interpretation the Pareskys advance is not foreclosed in the Eleventh Circuit, and thus, whatever the eventual merits of their position, the Pareskys *could have filed* their claims there originally.

The final element the court must consider is whether a transfer to the Southern District of Florida is "in the interest of justice." 28 U.S.C. § 1631. The Federal Circuit has characterized the interest-of-justice component of Section 1631 as "relat[ing] to claims which are nonfrivolous and as such should be decided on the merits." *Galloway Farms, Inc. v. United States*, 834 F.2d 998, 1000 (Fed. Cir. 1987) (citing *Zinger Constr. Co. v. United States*, 753 F.2d 1053, 1055 (Fed. Cir. 1985)). The Federal Circuit defined frivolous claims as including "spurious and specious arguments," quoting the Fifth Circuit and D.C. Circuit, respectively, as framing them as "legal points not arguable on their merits" and "those whose disposition is obvious." *Galloway Farms*, 834 F.2d at 1000 (citing *Devices for Med., Inc. v. Boehl,* 822 F.2d 1062, 1068 (Fed. Cir. 1987); *Caldwell v. Palmetto State Sav. Bank of S.C.*, 811 F.2d 916, 919 (5th Cir. 1987); *Reliance Ins. Co. v. Sweeney Corp., Md.,* 792 F.2d 1137, 1138 (D.C. Cir. 1986)). Implicit in the Federal Circuit's framing, then, is the dichotomy between frivolous claims, which should not be transferred, and claims that are non-frivolous "and as such should be decided on the merits." *Galloway Farms*, 834 F.2d at 1000.

The government raises several arguments as to why, even if transfer is found appropriate, the Pareskys' claims as to certain tax years should be dismissed rather than transferred because they were assertedly untimely presented to the IRS. *See* Def.'s Suppl. Brief at 3-7. The government does concede, however, that the claim as to tax year 2007 is timely, *see id.* at 4, upon which the Pareskys seize in asserting that "[t]his concession alone mandates that the [c]ourt transfer [p]laintiffs' lawsuit in its entirety [because] . . . the applicable statute does not permit a transferor court to dispose of any portion of the lawsuit before granting the transfer," Pls.' Suppl. Brief at 1. Indeed, the Pareskys go further, asserting that "the applicable transfer statute does *not* permit a court to transfer some claims in a lawsuit but dispose of others[;] . . . this [c]ourt . . . cannot shape or otherwise control how the case is transferred . . . . Therefore, if the [c]ourt determines it lacks jurisdiction, [p]laintiffs' lawsuit must be *transferred in its entirety, as if it were originally filed in the transferee court.*" *Id.* at 4 (emphasis in original). On this point, plaintiffs are simply incorrect on the law. At least as far back as 1999, the Federal Circuit concluded that "[Section] 1631 allows for the transfer of less than all of the claims in a civil action," *United States v. County of Cook, Ill.*, 170 F.3d 1084, 1089 (Fed. Cir. 1999), and more recently reiterated this interpretation of Section 1631, *see Harbuck v. United States*, 378 F.3d 1324, 1328 (Fed. Cir. 2004). The court notes, however, that "there currently exists a circuit split regarding whether a court may transfer less than a full action under" Section 1631. *See McCullough v. Royal Caribbean Cruises, Ltd.*, 268 F. Supp. 3d 1336, 1352 (S.D. Fla. 2017) (listing conflicting decisions).

The possibility of partial transfer notwithstanding, the court nevertheless declines to engage in a detailed merits review of the type that would be necessary to evaluate the government's claims that the Pareskys failed to timely file their administrative claims for particular tax years. The Federal Circuit has framed this issue as one in which evident lack of merit is the touchstone of when the interest of justice does not favor transfer. On the record as it stands before the court presently, the court cannot conclude that the Pareskys' claims rest on "spurious and specious arguments," a "distortion and disregard of the record and opposing

17

authorities, which indicate plainly that the present [case] does not rest on the razor's edge of frivolity, but falls clearly on the side of the frivolous," involve "legal points not arguable on their merits," or are "those whose disposition is obvious." *Galloway Farms, Inc.,* 834 F.2d at 1000 (internal citations and alterations omitted).  In short, based upon the limited inquiry the court is able to undertake given the already-acknowledged lack of jurisdiction, the court cannot conclude that the Pareskys' claims are manifestly without basis in law and fact.  As such, the interest of justice favors resolution of them on the merits and thus transfer of the entire case.

Having satisfied all three requirements of Section 1651, the Pareskys have shown that transfer is appropriate under the current circumstances.

## CONCLUSION

For the reasons stated above, the government's motion to dismiss plaintiffs' complaint pursuant to RCFC 12(b)(1) is DENIED as moot.  The plaintiffs' cross-motion to transfer the case to the Southern District of Florida is GRANTED.  The clerk shall transfer this case to the United States District Court for the Southern District of Florida.

**IT IS SO ORDERED.**

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge